# Chestnut Street Trust & Saving Fund Company to use, Appellant, *v.* Record Publishing Company.

*Corporations—President—Promissory notes—Power of president— Statute of limitations—Notice.*

1. Where the stockholders and directors turn over to an officer the full and absolute management of all corporation affairs, and permit him to exercise unrestrained control for a long course of time without instruction from or reference to any other authority, prima facie, the officer so intrusted may be taken to have power to do any act which the directors could authorize or ratify.

2. Where from its inception, the stockholders and directors of a corporation completely abandon to the president the entire management and control over its affairs, the corporation is liable on its promissory note given by the president without any express authority from the board of directors, or subsequent ratification, where he uses the proceeds for his own purposes and the corporation derives no benefit therefrom, and where the note is given to one paying full value without any knowledge of a wrongful intention on the part of such president.

3. In such a case the statute of limitations is tolled by payments of interest made through the personal check of the president, he being the owner of almost the whole capital stock of the corporation and in the habit of commingling its funds in one account with those of his own. The fact that such president was also the president of the financial institution to which the note was given does not fix the latter corporation with knowledge of a wrongful intent on his part.

Argued Jan. 19, 1910. Appeal, No. 254, Jan. T., 1909, by plaintiff, from order of C. P. No. 2, Phila. Co., March T., 1899, No. 170, sustaining exceptions to referee's report in case of The Chestnut Street Trust & Saving Fund Company, to the use of Richard Y. Cook and George H. Earle, Jr., Assignees for the benefit of the creditors of The Chestnut Street Trust & Saving

Fund Company, v. Record Publishing Company.   Before
Fell, C. J., Brown, Mestrezat, Potter, Elkin, Stewart
and Moschzisker, JJ.   Reversed.

Assumpsit on a promissory note.

The case was referred to Dimner Beeber, Esq., as referee.

The referee reported in favor of the plaintiffs for the full
amount of the claim.

Exceptions to report of the referee were sustained by the
court in an opinion by Wiltbank, J., and judgment was
entered for the defendant.

*Errors assigned* were in dismissing exceptions to report of
referee and in entering judgment for defendant.

*P. F. Rothermel, Jr.,* for appellant.—That the note in suit,
it having been made by Singerly as president, he having con-
trol of the business and finances of the corporation, the borrow-
ing of money and the issuing of notes, is a valid note of The
Record Publishing Company is clearly sustained by the au-
thorities: Dougherty v. Hunter, 54 Pa. 380; Culver v. Pocono
Spring Water Ice Co., 206 Pa. 481; Tourtelot v. Whithed, 9
N. D. 407 (84 N. W. Repr. 8); Quee Drug Co. v. Plaut, 55 App.
Div. 87; Cunningham v. German Ins. Bank, 101 Fed. Repr.
977; Kraft v. Pub. Co., 87 N. Y. 628; First Nat. Bank v.
Flour-Mills Co., 39 Fed. Repr. 89; McElroy v. Horse. Co., 96
Wis. 317 (71 N. W. Repr. 652); Martin v. Paper Mfg. Co., 44
Hun (N. Y.), 130; Africa v. Tribune Co., 82 Minn. 283 (84
N. W. Repr. 1019); Oakes v. Water Co., 143 N. Y. 430 (38
N. E. Repr. 461); McKiernan v. Lenzen, 56 Cal. 61; Magowan
v. Groneweg, 14 S. D. 543 (86 N. W. Repr. 626); Northwestern
Fuel Co. v. Lee, 102 Wis. 426 (78 N. W. Repr. 584); St. Clair v.
Rutledge, 115 Wis. 583 (92 N. W. Repr. 234).

Singerly's knowledge would not be imputed to the trust
company: Gunster v. Heat & Power Co., 181 Pa. 327; United
Security Life Ins., etc., Co. v. Bank, 185 Pa. 586.

*John G. Johnson,* with him *James Wilson Bayard,* for ap-
pellee.—The appellant was chargeable with notice that the

note was not drawn by the authority, or for the benefit, of the appellee and by its action furthered the improper use of the note. It cannot, therefore, recover thereon: First Nat. Bank v. Darlington, 25 Pa. Superior Ct. 438; Bangor, etc., Ry. Co. v. Slate Co., 203 Pa. 6.

The present case is much more nearly in accord with the Millward-Cliff Cracker Co.'s Case, 161 Pa. 157, than with the Gunster Case, 181 Pa. 327.

The note in suit, being a demand note, the present action, which was not brought until more than six years after its date, was barred by the statute of limitations: Swearingen v. Dairy Co., 198 Pa. 68; Andress' App., 99 Pa. 421; Milne's App., 99 Pa. 483.

OPINION BY MR. JUSTICE MOSCHZISKER, February 14, 1910:

Three questions are involved in this case: 1. Where from its inception, the stockholders and directors of a corporation completely abandon to the president the entire management and control over its affairs, is the corporation liable on its promissory note given by the president without any express authority from the board of directors, or subsequent ratification; where he uses the proceeds for his own purposes and the corporation derives no benefit therefrom; and where the note is given to one paying full value without any knowledge of a wrongful intention on the part of such president?

2. In such a case is the statute of limitations tolled by payments of interest made through the personal check of the president, he being the owner of almost the whole capital stock of the corporation and in the habit of commingling its funds in one account with those of his own?

3. Would the fact that such president was also the president of the financial institution to which the note was given fix the latter corporation with knowledge of a wrongful intent on his part?

For many years prior to 1890, William M. Singerly was the sole proprietor and owner of a daily newspaper known as "The Record." On June 28, 1890, he and four other incorporators organized The Record Publishing Company, corporation

defendant. Singerly turned over to the new company the Record newspaper with all of its assets, and received in payment 9,600 shares of the 10,000 shares of capital stock, and also its entire bond issue. These securities were hypothecated for loans to him. He was the president of the company from its organization to the time of his death. The company had no by-laws and no officers designated to give notes. It gave from time to time a number of notes aggregating $500,000, which were signed by Singerly as president, and the proceeds of which, except in one instance, were used by him for his own purposes, and not for the purposes of the company. It does not appear just how or in what form these notes were issued, nor that the directors knew of their issuance. The company was a "one-man" affair, and Singerly managed and controlled all of its business and finances, without instructions from or reference to the officers or stockholders. Neither stockholders nor directors held meetings except for the purpose of organization, and once a year to elect officers. At the time of its organization the board passed the following resolution: "Resolved, that the management and administration of 'The Record' be left to the direction of the president." After passing this resolution the directors abandoned to the president all their active duties. They did nothing to limit or define his powers, or to ascertain how he was managing the affairs of the company. In the words of the referee, they gave him "carte blanche" to do as he pleased, as though the real owner of the property. During this time Singerly was also the president of the plaintiff corporation, The Chestnut Street Trust & Saving Fund Company, and the owner of a large block of its stock. Although Singerly was president of the trust company, and usually, though not always, the dominant power in its affairs, yet this company was managed by its board of directors, and was not a "one-man" concern like the publishing company. On October 5, 1891, $30,000 was borrowed from the trust company on a note of the publishing company signed by Singerly as president. The payment was made by the check of the trust company, signed by Singerly as its president, and by the treasurer. Singerly received the

check and used the funds therefrom for his own purposes, none of them going into the treasury or being used for the benefit of the publishing company. There was no evidence to show that the trust company or any of its officers, aside from Singerly, had knowledge when the loan was made that Singerly intended using the $30,000 for his own purposes; and the whole transaction appears on the books of the trust company as a loan to the publishing company. Bills for interest were regularly rendered to the publishing company. These bills were paid by Singerly's personal check down to 1897, and were receipted for by the treasurer of the trust company as received from William M. Singerly. When the trust company went into the hands of a receiver, December 4, 1897, a demand was made on the publishing company for payment. This was refused on the ground that Singerly had no authority to give the note, and the company had derived no benefit therefrom. Suit was instituted, and the case went to a referee. The referee found in favor of the trust company, holding that the stockholders and board of directors of the publishing company had abandoned the entire management of the business and the finances of their corporation to the president, and had allowed him absolute control, and therefore the president had the power to borrow money and to give paper binding the corporation. Further, that the statute of limitations was tolled by the payments of interest on the note; that the president had the power to act for the corporation in paying the interest, and the fact that he paid by his individual check would make the payments none the less those of the corporation.

The common pleas reversed, passing over the real ground upon which the referee had placed his findings, and holding that Singerly as its president had no implied authority to give notes in the name of the publishing company; and as the evidence showed no express authority or ratification after knowledge of the transaction, he must be held to have acted without authority, and the company was not bound by his act; and further, holding the claim stale and barred by the statute.

Under the referee's findings of fact which were expressly adopted by the court below and not attacked here, the fact

that the payments of interest were made by Singerly's personal checks would not make these payments insufficient to toll the statute. The referee finds that Singerly had a habit of mixing the money belonging to The Record Publishing Company with his individual or personal account, and also with the account of another company in which he was interested. He further finds: "In fact it appears that he used the funds of each one of them indiscriminately by mingling it with the moneys of either one of the other accounts, so that it was impossible to say at any given time just how much of the money of each was deposited in the account of the other. Such being the case, every time that Singerly drew his individual check, so far as the evidence goes, it might just as well have been the money of The Record Publishing Company as the money of Singerly individually." Aside from this finding by the referee, if a third party pay interest on a debt, and the conduct of the debtor be such as to justify the creditor in assuming that the payments are made with its authority and on its behalf, though it may appear that the third party is getting an incidental benefit therefrom, this will not prevent such payments from tolling the statute. If the referee were right in holding that Singerly had authority to execute the note, it would follow that he had authority to make the payments of interest. This brings us to a consideration of the question of the authority of Singerly to give the note in the first instance. The by-laws being silent as to the officer authorized to give such notes, it becomes a question of fact to be decided from the evidence. Where the stockholders and directors turn over to an officer the full and absolute management of all corporation affairs, and permit him to exercise unrestrained control for a long course of time without instructions from or reference to any other authority, prima facie the officer so intrusted may be taken to have power to do any act which the directors could authorize or ratify. In the recent case of the First National Bank v. Colonial Hotel Company, 226 Pa. 292, it was held that a general and universal course of dealing by a corporation through a particular officer will give rise to an implied power to act and bind the corporation, and that such implied

power will protect one so dealing with the corporation for the first time, even though such person had no previous knowledge of the manner in which the corporation was being conducted. In the present instance, the evidence as to the whole course of conduct of the officers and stockholders of the publishing company in allowing Singerly absolute control was sufficient to justify a finding that he was thereby vested with power to borrow money on the note of the company. If he had such authority he committed no wrong in its exercise, and if after getting the money he misappropriated it, the loss falls upon the publishing company, and not upon the trust company which made the loan without the knowledge of any wicked intention on the part of Singerly. The fact that Singerly may have intended to do a wrong when he borrowed the money would not fix the trust company with such knowledge merely because he happened to be its president and acted in that capacity at the time of the loan. "An exception to the general rule that notice to an agent is notice to a principal arises in case of such conduct of the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the agent acts for himself in his own interest and adversely to that of the principal:" Gunster v. Scranton Illuminating, Heat & Power Co., 181 Pa. 327. There was nothing on the face of the note in this case to put the trust company on notice of an intended wrong and suggest investigation. Had the trust company endeavored to investigate, its only obligation would have been to look for evidence of the power of the president to sign the note, and not to ascertain the use to which the money was to be put. If such an investigation had been made, the trust company would have discovered ample apparent power vested in Singerly to justify it in taking the note.

The assignments of error are sustained; the judgment is reversed, and the record is remitted to the court below with directions to enter judgment for the plaintiff upon the report of the referee.