# MORTON v. LOVELL BLDG. CO.
## (RIES, et al., Interveners)
### (No. 1683; March 31, 1931; 297 Pac. 799)

82

For the interveners and appellants there was a brief by *E. J. Goppert,* of Cody, Wyoming, and *L. S. Strahan, pro se,* of Lovell, Wyoming, and oral argument by *Mr. Strahan.*

For the plaintiff and respondent there was a brief by *Hagens & Murane,* of Casper, Wyoming, and oral argument by *Mr. Hagens.*

*E. J. Goppert* and *L. S. Strahan,* supplemental brief.

*Hagens & Murane's* answer brief of plaintiff and respondent to intervener's supplemental brief.

RINER, Justice.

This is a suit to foreclose a real estate mortgage and to recover a deficiency judgment upon the indebtedness

claimed to have been secured thereby. Plaintiff, S. E. Morton, obtained a decree in her favor below, against the defendant Lovell Building Company and interveners H. J. Ries and L. S. Strahan. The interveners only, bring the record here by direct appeal for review.

The facts are very little, if at all, in dispute, and, so far as material to the disposition of the case in this court, are substantially as follows:

On or about the 12th day of June, 1916, the Lovell Building Company, hereinafter generally referred to as the "Building Company," was incorporated under the law of this state. It had a capital stock of $40,000, which was divided into 400 shares of the par value of $100 each. W. B. Snyder and J. M. Snyder of Lovell, Wyoming, each held 120 shares of this stock and the remainder, or 160 shares, was owned by H. J. Ries of Billings, Montana. The object of the company was, as expressed in its certificate of incorporation, "to carry on, conduct and engage in a general real estate investment business, and as incident to such business hold and acquire real estate and personal property and to carry on such transactions and do and perform all acts necessary and incident to the proper carrying on and conducting of said business." The directors of the corporation were three in number, and the stockholders already mentioned were selected to serve in that capacity for the first year of the corporation's existence and apparently until the commencement of this action, on July 5, 1928, remained the same. At the inception of its corporate existence, H. J. Ries became the Building Company's president, holding that position until 1925 or 1926, when W. B. Snyder, who had previous to that time been its vice president, took the office. J. M. Snyder has always been its secretary and treasurer. W. B. Snyder had charge of the active management of the company affairs, at least since 1920 and 1921, and he and his brother J. M. Snyder, as secretary, then customarily signed the Building Company's papers where loans were negotiated for it.

On or about October 24, 1917, Mr. Ries, the president of the company, with the concurrence of the Snyders, negotiated a loan of $15,000.00 to the Building Company by Dickerman Brothers of Duluth, Minnesota. This was evidenced by a note for that sum, secured by a first mortgage upon the corporation's real estate property. Ries, in like manner and about the same time, also arranged for a loan to the Building Company by the Montana National Bank for the sum of $10,000. This loan was represented by a note for that amount and a second mortgage on the property aforesaid. Subsequently this second mortgage loan was paid off.

From the years 1920-1921 until a comparatively short time before the trial of this action, Ries ceased to be active in or at all concerned with the affairs of the Building Company. Since those years he never attended any corporate meetings of either the stockholders or directors of the company and no notice of such meetings was ever given him. He never came to the Snyders or to the office of the company at all for the purpose of inquiring about the business of the company. In all that time he never even wrote to them to learn of the condition of the corporation; never asked for a statement regarding its matters or took any interest whatsoever in it. As Mr. W. B. Snyder testified: "I haven't heard from Mr. Ries for years. He just seemed to have lost all interest." He lived in Billings, "until his banks failed and then he was worse than broke, and he went to Oregon." He seems to have negotiated a personal loan for $5800—just when the record does not show—with the First National Bank of Cheyenne, Wyoming, and to have given his note for that amount with his aforesaid 160 shares of stock as security. This note appears never to have been paid.

W. B. Snyder and his brother exercised complete control and management of the Building Company's affairs after Ries ceased to give them his attention. They borrowed money from the First National Bank of Cheyenne, incur-

ring an indebtedness of $1,000, for which the Building Company's note was given. This note was subsequently paid off. W. B. Snyder testified: "The First National Bank in Cheyenne was quite helpful to the Lovell Building Company. It financed the Lovell Building Company when they needed money."

Under date of January 4, 1924, a note was executed payable to the order of the Lovell Building Company for $20,000, due July 5, 1924 at the First National Bank, Cheyenne, Wyoming, bearing interest at the rate of eight per cent per annum, the note being signed "Lovell Building Company, by W. B. Snyder, Vice President, Attest J. M. Snyder, Secretary," and was indorsed exactly as signed. This paper was then delivered by W. B. Snyder to the First National Bank aforesaid and the Building Company received in exchange therefor sundry notes also totalling $20,000 in face value, but which were known at the time by Snyder to be "slow paper" and which thereafter proved to be worthless. The latter's testimony indicates, as he says, that the note may have been taken by the bank "partly" in order to help out that institution, which thereafter, sometime during the period from January 4, 1924 to January 26, 1925, failed. A directors' meeting was held by the Snyders to authorize the $20,000 note transaction, but no notice was given Ries thereof and he knew nothing of the matter.

Thereafter the plaintiff herein, Sarah E. Morton, purchased said note from the First National Bank, before that institution passed into the hands of a receiver. She testified on the trial of this case concerning the purchase that she paid face value for the paper—$20,000; that she bought it before maturity; that she did not know then that anyone connected with the Building Company disputed the authority of the Snyders to execute the note; that she presumed the Building Company received pay for the note; that the First National Bank official, Mr. Abbott, who sold her the note, assured her "it was gilt edge security;" and that she

"never bought anything past due in paper." The note was delivered to her without any indorsement on it on the part of the bank. Her testimony just summarized concerning these matters stands in the record undisputed.

When this obligation became due, the Snyders advised the plaintiff that it could not be paid, and they arranged with her to continue it. Consequently, on January 26, 1925, a renewal note was given, payable to her order for the sum of $21,684.44, due three years after date with interest at six per cent per annum—said renewal note being signed "Lovell Building Company, by W. B. Snyder, Vice Pres., J. M. Snyder, Secretary." At the same time, and to secure the payment of this indebtedness, she received a real estate mortgage recited as subordinate to the Dickerman Brothers' mortgage already mentioned upon the real estate property of the Lovell Building Company. This mortgage was signed "Lovell Building Company, by W. B. Snyder, Vice President." The corporate seal of the company was affixed, attested by J. M. Snyder, Secretary. The instrument was duly acknowledged by W. B. Snyder and J. M. Snyder, as vice president and secretary respectively of the Building Company, "as the free and voluntary act and deed of said corporation for the uses and purposes therein set forth, they being thereunto duly authorized by its board of directors," and properly placed of record in the office of the county clerk of Big Horn county. Interest on this last mentioned note appears to have been several times paid, and until July 26, 1925.

In the fall of 1925, the matter of the disposition of the Dickerman first mortgage came up, and the Snyders agreeing with the plaintiff that it was better to get all the obligations of the Building Company together, she paid off the $15,000 and accrued interest due the Dickerman Brothers, and, on November 9, 1925, was given three notes, all of that date, each payable to her order, bearing seven per cent interest per annum and each signed "Lovell Building Company by W. B. Snyder, President, Attest J. M. Snyder,

Secretary.'' One of these notes was made for $3,000, due one year after date, another for $3,000, due two years after date, and the third for $30,274 and due three years after date. These notes were secured by a real estate mortgage of even date therewith upon the real estate property of the Building Company. This mortgage was signed ''Lovell Building Company by W. B. Snyder, President.'' Its corporate seal was attached, duly attested by ''J. M. Snyder, Secretary.'' The instrument was officially acknowledged by these officers of the corporation as their free and voluntary act and deed and that of the Building Company, and was duly recorded in Big Horn County, Wyoming. A meeting of the directors of the Building Company, other than Ries, was had, authorizing the issuance of these three notes and the mortgage security.

The minute book record of corporate meetings of the Building Company appears to have been lost, and, as already indicated, Ries received no notice or knowledge of the meetings authorizing the several renewal notes and mortgages and knew nothing of the existence of those instruments themselves.

Plaintiff testified without contradiction that at the time these new notes 'and the mortgage securing them were executed and delivered, she knew of no one claiming that there was any want of authority on the part of the Snyders to execute the papers. She was assured by them that the Building Company would do everything in its power to reduce the indebtedness.

A number of interest payments over a period of several years, were made by the Building Company on account of this final form of the obligation, but in the course of time the principal sums of the two $3,000 notes fell due and were not paid. Interest on all the notes too became in arrears. The Snyders repeatedly asked plaintiff to refrain from foreclosure proceedings and this she did for some time.

Matters were in this condition when on March 27, 1928, the intervener L. S. Strahan purchased from the receiver of

the First National Bank of Cheyenne the note of H. J. Ries heretofore mentioned, with its accompanying stock collateral. The note was then long past due. The purchaser, when asked on cross-examination what he paid for it, responded: ''I don't know,'' — saying he bought it with a group of other notes.

Finally, on July 5, 1928, this suit was filed to foreclose the mortgage given to secure the three notes above described. A receiver of the mortgaged property was appointed by the court and took charge thereof, upon the acquiescence of the Snyders, who told plaintiff that they were ''perfectly willing'' she ''should take the property now; they felt as though they couldn't pay out.'' Nothing further appears to have been done in the case until July 24, 1929, when, upon leave of court, L. S. Strahan, appearing as attorney for the Building Company, filed an answer denying generally the allegations of the foreclosure petition, claiming the mortgage sought to be foreclosed was given without consideration and without authority from the board of directors of the Building Company. A cross-petition was also included, claiming payments of money from the assets of the Building Company to the plaintiff, also without any consideration or benefit to the former. Plaintiff filed a reply putting in issue these charges. Subsequently and on September 16, 1929, the case came on for trial.

The authority of L. S. Strahan to represent the Building Company being questioned, the court heard the matter and sustained plaintiff's motion to strike the answer filed by him as aforesaid. Leave, however, was given H. J. Ries and L. S. Strahan to file their petition in intervention. That pleading set up the ownership by Ries of the 160 shares of stock in the Building Company, its pledge as collateral for Ries' note, and Strahan's present ownership thereof. The petition also set out the defenses asserted in the answer already mentioned, charging further that Ries, as director and stock holder, knew nothing about and never consented to the giving of the mortgage in suit, that it was not within

the objects of the Building Company and that it included all the assets of the corporation. These claims were all placed in issue by plaintiff's answer thereto, which also detailed the transaction whereby the notes and mortgage in suit were given and the reliance of plaintiff upon the representations of the officers of the Building Company as to their due authority in the matter. Interveners filed a reply in form a general denial of the new matter set out in plaintiff's answer.

On the trial of the action the Snyders, as officers and majority stock holders of the Building Company, made no defense in its behalf, but in all respects conceded the validity of plaintiff's claim. Ries did not appear as a witness, but upon the affidavit of his counsel L. S. Strahan for a continuance of the trial to obtain his testimony, it was conceded by plaintiff that if present he would testify to his ownership of 40 per cent of the Building Company's stock; that he did not know of the pleaded mortgage or note until recently; that he had no notice of the meeting for the purpose of giving same; that he never authorized them to be given; that he never ratified or acquiesced in the giving of said notes and mortgage and that they were without consideration, so far as he knew.

The court, in substance, found the issues, generally, in favor of the plaintiff and against the defendant and the interveners, adjudged that plaintiff recover of the Building Company $41,839.51, with interest from September 16, 1929 and attorney's fees, that the mortgage be foreclosed and the property covered by it sold, and that if a deficiency resulted after the sale was had, the Building Company should be liable for its payment. It is from this decree that this appeal has been prosecuted.

As we understood the position of the interveners, announced on the argument of the case here, it is not insisted that the Dickerman mortgage indebtedness and the rights of the plaintiff obtained by paying it upon agreement with the officers of the Building Company should not be recog-

nized by the court's decree of foreclosure. Indeed, no other position is tenable, for it will be recalled that Ries himself, with the acquiescence of the Snyders, negotiated that loan, and, so far as appears from the record, the corporation received the benefit of it. Neither Ries himself nor the corporation would be in a position to question that transaction at this time. Whatever rights L. S. Strahan may have acquired by his purchase of the Ries note with attached collateral stock, they are certainly not greater than those of Ries or of the corporation itself. I Morawetz on Corporations, § 627.

But that part of the indebtedness and the mortgage to secure it, which is based upon the original note of $20,000 given by the Building Company to the First National Bank of Cheyenne in January, 1924, interveners say cannot be upheld. They assert that it was delivered without legal authority; that Ries had no notice of the directors' meeting of the corporation at which its issuance was ordered; that he knew nothing about the transaction, never ratified it; that the corporation received no benefit from it; that it was wholly without consideration and nothing more than an accommodation for the benefit of the bank to which it was given, to aid that institution in its financial difficulties. To all this the plaintiff replies, in effect, that she bought the note from the bank in good faith, before its maturity, paying full face value for it and without any knowledge of any invalidity in its issuance or the title of the bank negotiating it.

While the Building Company received in return for the delivery of the note of $20,000, the same amount of "slow paper," this thereafter, if not at the time, was regarded as worthless, and while the president of the Building Company testified that the First National Bank financed its company when it needed money, we shall, for the purposes of this discussion, assume that the note was given simply for the accommodation of the bank. It must be considered that it is established, too, that this note was delivered pursuant to

authority given by a directors' meeting of which Ries had no notice.

The authorities make it perfectly clear that the issue or indorsement of negotiable paper by a corporation for the accommodation of another is ordinarily ultra vires, but of such a character that the circumstances indicating the invalidity of the act may obtain, independent of the form of the instrument or the nature of the transaction. Where the form of the instrument, or the nature of the transaction do not charge the purchaser thereof with knowledge of its accommodation character, and one buys the paper in good faith before maturity, without notice of any invalidity therein or in the title of the vendor, a different rule prevails.

3 Fletcher, Cyclopedia of the Law of Private Corporations, p. 2670, § 1596, states the law thus:

"A corporation has no power to issue, accept or indorse a negotiable instrument for the mere accommodation of another; but it cannot set up its want of power as against a bona fide purchaser for value before maturity, where he takes the note or acceptance in ignorance of the fact that it is merely accommodation paper. It may do so, however, as against a purchaser with notice of the ultra vires character of the instrument; and this is the rule under the Negotiable Instrument Law."

Another well known text, 3 Thompson on Corporations (3rd Ed.) 992-3, § 2303, says:

"Notwithstanding the rule that corporations have no power to make and endorse negotiable paper for accommodation, yet it is held that such paper will be good in the hands of an innocent purchaser for value without notice of such fact. * * * And where a corporation has the power to execute a negotiable promissory note, then any such note in the hands of a holder in good faith for value before maturity, will bind the corporation, although made as an accommodation note."

To the same effect is 4 Cook on Corporations (8th Ed.) 3523-4, § 774:

"The general rule is that the accommodation indorsement, signature, or guaranty of the corporation is illegal and cannot be enforced. The indorsement, however, though not enforceable by parties taking it with notice that it was for accommodation, may be enforced by bona fide holders."

A leading and oft-cited case on the point is Monument National Bank v. Globe Works, 101 Mass. 57, 3 Am. Rep. 322. It was there urged, as it is here, that:

"To issue an accommodation note is not within the powers conferred upon the corporation; and that, as any persons taking it had notice that it was the note of the corporation they had notice that it was of no validity unless issued for a purpose within the scope of the corporate powers, and were therefore bound to ascertain not only that it was executed by the officer of the corporation who had the general authority to sign the notes which they might lawfully make, but that the purpose for which it was issued was such as the charter authorized them to entertain and execute."

Declaring that the court were all of the opinion that the position was untenable as against the owner of a note of a manufacturing corporation taken in good faith for value before maturity, and without any knowledge that the makers had not received the full consideration, the court further remarked:

"It has long been settled in this Commonwealth that a manufacturing corporation has the power to make a negotiable promissory note. Narragansett Bank v. Atlantic Silk Co., 3 Met. 282. And it was held in Bird v. Daggett, 97 Mass. 494, as a just corollary to that proposition, that such a note in the hands of a holder in good faith for value is binding upon the maker, although made as an accommodation note. The question was not discussed, nor the reasons for the decision fully stated, in Bird v. Daggett; but it was assumed that the doctrine announced was clear and undoubted law."

And the corporation was held liable upon the note.

In Jacobs Pharmacy Co. v. Southern Banking & Trust Co., 97 Ga. 573, 25 S. E. 171, 172, another case frequently referred to by the courts discussing the subject we are considering, the action was by the Trust Company upon a promissory note, payable to the order of the Pharmacy Company and indorsed by it. The latter's defense was, among other things, that "it was a corporation, and did not, through its proper officer, indorse the note sued upon; that, while its name was signed thereon by Joseph Jacobs, who was its secretary at the time, he had no authority to make the indorsement; that its relation to the note was merely that of an accommodation indorser, and the transaction was therefore ultra vires." It appeared the secretary of the Pharmacy Company alone had previously been allowed to sign and indorse the notes of the company. Holding the corporation liable upon the paper, it was said in the course of the court's opinion:

"Every trading corporation, unless forbidden by its charter, has the power to issue negotiable paper in the due and ordinary course of its business; and where a corporation having this power makes or indorses such paper, although for an unauthorized purpose, the defense of ultra vires will not avail it as against an innocent purchaser, who, bona fide and for value, acquires title to the paper before maturity. This has been frequently held in cases where, as in the present case, the defense was that the indorsement was for accommodation only."

The case of Central Trust Company v. Smurr & Kamen Machine Co., 191 Ill. App. 613, presented the sole question whether the promissory note of an Illinois manufacturing corporation, which had been executed and delivered to another company solely for the latter's accommodation, and which was indorsed and sold to a third party, who bought in good faith before maturity and without notice that it was accommodation paper, could be enforced as against the maker. Counsel for the defendant urged that the execution and delivery of the note in question was an ultra vires

action on the part of the defendant corporation, and hence absolutely void, even in the hands of a bona fide purchaser for value before maturity, without notice of the character of the paper. Affirming the judgment against the corporation issuing the note, which had been given solely for the accommodation of the payee, the court said:

"There is a clear distinction, as was pointed out by Mr. Justice Campbell in Zabriskie v. Cleveland, Columbus & Cincinnati Railroad Co., 23 How. 381, 398, 16 L. Ed. 488, by Mr. Justice Hoar in Monument Bank v. Globe Works, 101 Mass. 57, 58, 3 Am. Rep. 322, and by Lord Chancellor Cairns and Lord Hatherly in Ashbury Railway Carriage & Iron Co. v. Riche, L. R. 7 H. L. 668, 684, between the exercise by a corporation of a power not conferred upon it, varying from the objects of its creation as declared in the law of its organization, of which all persons dealing with it are bound to take notice; and the abuse of a general power, or the failure to comply with prescribed formalities or regulations, in a particular instance, *when such abuse or failure is not known to the other contracting party.*"

The consequences of a contrary rule were indicated in the following language:

"If the contention of defendant's counsel were to prevail, it would charge every bona fide purchaser of the commercial paper of business corporations with the duty of ascertaining, at his peril, before purchasing the same, all the facts with reference to the consideration for which such paper was issued. No case has been cited, and we know of none, in which such a rule has been announced with reference to ordinary business corporations, having the general power to issue negotiable paper. Doubtless all purchasers of commercial paper are chargeable with notice of such facts as appear upon the face of the paper offered for sale by a business corporation and of all limitations imposed by statute upon the powers of such corporations. But to carry this principle to the length contended for in this case would make it extremely hazardous for any bank to use the paper of such corporations in any business transaction."

In Farmers National Bank v. Sutton Manufacturing Co., 52 Fed. (C. C. A. 6th Circuit) 191, 17 L. R. A. 595, holding that a corporation accepting a bill of exchange without consideration merely for the accommodation of the drawee, was liable to a bona fide indorsee for value before maturity, Judge Taft pointed out that:

"There are acts that may or may not be within the charter powers, their lawful character being dependent on the existence of a fact which cannot be known from the act itself. If the extrinsic fact upon which depends the lawful character of the act is one peculiarly within the knowledge of the general agent of the corporation by whom the act is done, the act itself is an implied representation that the necessary fact exists, the truth of which the corporation is estopped to deny against any person who in dealing with the corporation has parted with value on the faith of it. The principle has been frequently applied in cases of commercial paper issued in the name of the corporation by its officers having general authority to issue such paper."

The note appearing in Ann. Cas. 1913A, at page 1314, on the authority of an elaborate list of cases, is to this effect:

"It is well settled that even though it is *ultra vires* of a corporation to make, indorse or accept commercial paper for the accommodation of another, yet such paper is good in the hands of a bona fide holder thereof for value and without notice of its accommodation character, if the corporation has power, under any circumstances, to issue, indorse, or accept negotiable paper."

In National Bank of Republic v. Young, 41 N. J. Eq. 531, 7 A. 488, 489, we find the rule stated in this language:

"The general doctrine of the law is that where a corporation has power under any circumstances to issue negotiable paper, a bona fide holder has a right to presume that it was issued under the circumstances which gave the requisite authority, and such paper is no more liable to be impeached for any infirmity in the hands of such a holder than any other commercial paper. Gelpcke v. City of Dubuque, 1

Wall. 175, 203, 17 L. Ed. 520; Supervisors Marshall County v. Schenck, 5 Id. 772, 784, 18 L. Ed. 556; Hackensack Water Co. v. DeKay, 9 Stew. Eq. 548. This doctrine is applied to commercial paper made by a corporation for the accommodation of a third person when in the hands of a bona fide holder, who has discounted it before maturity on the faith of its being business paper."

Of similar purport is the case of Rosenthal v. Thirty-fourth St. Shop., Inc., 129 Misc. 822, 222 N. Y. Sup. 733, 735, where it was said:

"In a case where a corporation has power to issue negotiable paper, and the purpose for which it is issued is not absolutely prohibited by statute, a bona fide holder of such paper will be protected, though it appears that the paper was unauthorized for the particular purpose for which it was made. The rule is that, where a corporation has under any circumstances power to issue negotiable paper, a bona fide holder for value, taking the paper before maturity, has the right to presume that it was issued under circumstances which gave the requisite authority, if it appears on the face of such negotiable paper that it has been duly issued by the corporation."

And 7 R. C. L. 603, § 598, says:

"According to the prevailing and more reasonable doctrine, even though it is ultra vires of a corporation to make, indorse or accept commercial paper for the accommodation of another, yet such paper is enforceable in the hands of a bona fide holder thereof for value and without notice of its accommodation character, if the corporation has power, under any circumstances, to issue, indorse, or accept negotiable paper."

Discussing the same subject and citing many cases in support of the view expressed, Judge Sanborn, in H. Scherer & Co. v. Everest, 168 Fed. (C. C. A. 8th Circuit) 822, 830, said:

"It is said that these notes were accommodation paper, that the issue of accommodation paper was beyond the

power of the Transfer Company, and that for that reason the notes constitute no valid claim against its estate. The corporation had no power to issue accommodation paper, and this fact would have been a perfect defense to these notes in the hands of any holder who knew they were accommodation paper when he purchased them. But the corporation had power to issue negotiable paper for value. 'When a corporation has power under any circumstances to issue negotiable securities, the bona fide holder has a right to presume that they were issued under the circumstances which give the requisite authority, and that they are no more liable to be impeached for any infirmity in the hands of such a holder than any other commercial paper.' City of Lexington v. Butler, 14 Wall. 282, 296, 20 L. Ed. 809. The Transfer Company intentionally gave these notes the false appearance of negotiable paper issued by it for value, and thereby induced the claimants to buy them. Where a corporation which has the power to issue negotiable paper puts forth accommodation paper beyond its power, it is estopped from denying that the latter was lawfully issued for value for the purpose of defeating the claim of a bona fide holder of such paper for value.''

Considering the situation presented by a corporation having power to issue negotiable paper, but where the issuance thereof is unauthorized or irregular, and furnishing a voluminous list of cases in support of the text, 8 C. J. 778-9 states the law to be this:

''Where the corporation has power to issue negotiable paper, and the purpose for which such paper was issued is not absolutely prohibited by statute, a bona fide holder thereof will be protected, although the instrument was unauthorized for the particular purpose for which it was issued, or was issued by an officer in fact not authorized to issue it, on the theory that the bona fide holder has the right to presume that it was issued under circumstances which give the requisite authority; and where the power to issue negotiable securities is granted a corporation by law, irregularity in its exercise, or mere noncompliance with a by-law as to the manner of execution, cannot be set up as a defense.''

Fletcher's Cyclopedia of the Law of Corporations, vol. 3, p. 3129, § 1935, citing many decisions, is to the same effect, it being said therein:

"If an officer issues negotiable paper in the name of a corporation, when he has no implied authority to do so by virtue of his office, and has not been clothed by the stockholders or directors with apparent authority, the paper is not binding on the corporation, even in the hands of a bona fide purchaser for value, since all persons are chargeable in such a case with notice of the want of authority. The paper is binding, however, in the hands of a bona fide purchaser, if authority to issue it was presumably incident to the office, or if the officer was clothed with apparent authority, although there may have been secret limitations upon his apparent authority, or although he may have issued the same for an unauthorized purpose."

The text then quotes from 2 Morawetz on Corporations, § 602, where similar conclusions are reached. See also I Daniel on Negotiable Instruments (6th Ed.) §§ 389, 390, 391.

Under these authorities, the position taken by the interveners in the case at bar, as above outlined, cannot, we think, be maintained. The Building Company clearly had general power to issue commercial paper in connection with the transaction of its regular business. Indeed, it did so in several instances shown in the record and particularly in the case of the Dickerman mortgage, and interveners now concede that transaction to have been valid. This being so, the plaintiff, occupying, as we think, the status of a bona fide purchaser of the $20,000 note, had a right to, as she testified she did, presume that it was issued under the circumstances which gave the requisite authority. Here were extrinsic facts — to paraphrase the language of Judge Taft — upon which the lawful character of the act depended, which were peculiarly within the knowledge of the general agents of the corporation by whom the $20,000 note was delivered to the First National Bank of Cheyenne. None knew better than they as to the requisite notice to directors in order to hold

a valid meeting thereof to issue the paper, the holding of such a meeting, and the existence or non-existence of the consideration for the paper when issued. That being so, the delivery of the paper to the First National Bank by the company's general officers, investing that institution with power to dispose of it, was an implied representation that all these necessary facts existed, the truth of which the Building Company should be estopped to deny against the plaintiff — a purchaser for full value before maturity, in good faith relying upon such representation.

There was nothing in the form of the note which was apart from the usual course of the execution of corporate paper. True, it was payable to the Building Company's order and signed by it, but it was also indorsed by it, which made the paper a complete negotiable instrument. Comp. Stat. of Wyoming 1920, § 4117. The fact that the First National Bank of Cheyenne did not place its indorsement thereon, in negotiating the paper to the plaintiff, is of no significance. The note in the condition in which it left the hands of the Building Company's officials was payable to bearer and was negotiable by delivery, simply. Comp. Stat. of Wyoming 1920, §§ 3942, 3967; Leavitt v. Wintman, 234 Mass. 248, 125 N. E. 390; Commercial Savings Bank v. Colthurst, 195 Iowa 1032, 188 N. W. 844; Commercial National Bank v. McCandlish, 23 Fed. (2nd) 986.

That the signature of the Building Company was affixed to the note by W. B. Snyder, as vice president, and the signature attested by J. M. Snyder, who was the secretary and treasurer of the corporation, can hardly affect the rights of the plaintiff. The proof is, that Ries himself, during the course of his service as president of the Building Company, negotiated several loans in its behalf, thus demonstrating that that official in the corporation had authority to do this, as presumably incident to his office. The record also shows that W. B. Snyder, as vice president, after Ries' withdrawal from any interest in the Building Company's affairs, also negotiated all loans, signed all corporate instruments and

generally managed the company's business. Any inquiry made as to why the vice president's name appeared on the paper, would merely have disclosed the fact that Ries was absent.

It is insisted on behalf of the interveners, that the renewal notes and mortgages given to plaintiff were without consideration and invalid. We do not think so. Plaintiff held the Building Company's note for $20,000, valid in her hands for the reasons already given. When it became due, the time for payment was extended for the Building Company, on both principal and accrued interest, and a new note, with mortgage securing it, was taken. Later these were replaced, additional time for payment again given the Building Company, the Dickerman indebtedness taken over by plaintiff, and the transaction being evidenced by the three notes and the mortgage in suit. The Building Company itself, over a period of years, has had the benefit of these forbearances to sue and extensions of time for payment of its indebtedness. Obviously there was consideration for all these renewal notes and mortgages, and the Building Company itself is in no position to complain. Brannan's Negotiable Instruments Law, pages 232, 235, 236; 8 C. J. 236, § 371 and cases cited; 41 C. J. 387, § 203 and cited cases; 14a C. J. 387-8, § 2241.

Something was said by interveners that the mortgage here involved covered all the corporate property of the Building Company, and was hence ultra vires in that respect. The record is not clear concerning this suggested ground of invalidity, but if it be so that all the corporate property was included in the mortgage, the rule appears to be, as stated in 4 Thompson on Corporations (3rd Ed.) 212, § 2605:

"The power to acquire or sell includes by necessary implication the power to mortgage. From this it follows that corporations possess, ordinarily, without any express grant, the power to mortgage all their property, to the same extent as a natural person may."

Of similar purport is 14a C. J. 556, § 2491 and cited cases. It may be observed, too, that the mortgages were obviously given not with the intention on the part of the Building Company's officers of abandoning its business, but in an honest effort to keep the corporation's business alive as long as possible. Foreclosure was acquiesced in by them only when it became clear that the Building Company's position was hopeless.

There is another phase of the case at bar which cannot be overlooked, and contributes directly to the result we shall reach in the disposition of this case. Interveners are entitled to claim whatever rights they have, only through the fact that Ries was a stockholder and director of the Building Company and did not receive notice of directors' meetings which authorized the several notes and mortgages of which complaint is made, the failure of the Building Company to receive consideration for the delivery of the $20,000 note, and his absence of knowledge and lack of his approval of these transactions carried on by the remaining stockholders, directors and officers. Whose fault was that? The record stands uncontradicted that Ries, from the years 1920-1921 up to almost the very trial of this suit, concerned himself not at all with the affairs of the Building Company. Although he was its president until 1925 or 1926, and one of its three directors all the while, he never so much as sent a letter of inquiry concerning the Building Company's transactions—to say nothing of failing to appear personally in an effort to learn what was being done. He knew that the remaining stock holders and officers must necessarily handle the business of the Building Company. Continuously for eight or nine years he closed his eyes and turned his back upon the Building Company and its affairs. No excuse for such conduct is advanced. Can he or the purchaser of his long overdue note with his stock as collateral thereto, claim want of notice of corporate meetings, want of knowledge of what was being done, lack of his approval of transactions had by the remaining officers or stock-

holders, or mismanagement on their part as against one who relied in good faith upon their acts and representations and parted with thousands of dollars in consequence? We do not think so. They should be estopped to assert such a claim.

In Martin v. Webb, 110 U. S. 7, 3 S. Ct. 428, 433, 28 L. Ed. 49, the court, speaking of a cashier, allowed by the directors of a bank to deal with third parties in a particular matter, strongly said:

"Directors cannot, in justice to those who deal with the Bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the Bank and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the Bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business."

This court, in State Bank v. Haun, et al., 30 Wyo. 322, 222 Pac. 45, 55, relative to the same subject and referring to other cases summarized them thus:

"In Halsell v. First National Bank, 48 Okl. 535, 150 Pac. 489, L. R. A. 1916B 697, it is held that a director is chargeable with knowledge of the corporate affairs of which it is his duty to become informed. In F. M. Davies & Co. v. Porter, 248 Fed. 397, 160 C. C. A. 407 it is held that directors must be held to have knowledge of facts which they could by slight diligence have ascertained."

And in Smith v. Stone, 21 Wyo. 62, 128 Pac. 612, 621, it was held that a delay, with knowledge, from October, 1906, to July, 1909, on the part of a minority stock holder, in attacking a sale of all the assets of the company to another corporation, was laches and the delay unreasonable where the rights of other parties had intervened, and there was

quoted with approval from Cook on Corporations (6th Ed.), § 732, the following:

"After a stockholder has knowledge of or is chargeable with knowledge of an *ultra vires,* fraudulent, or negligent act of the directors, he must institute his suit, if at all, within a reasonable time thereafter. As to what will constitute a reasonable time depends on the circumstances of the case. The length of time during which a stockholder may delay in bringing his suit varies with each case, according to the circumstances of that case. The court requires that reasonable promptness be exercised so that large investments of new money or changes in the ownership of the stock or property may not be prevented or jeopardized by an unreasonable delay on the part of a stockholder in objecting to the transaction."

Under these authorities Ries can very well be held to be chargeable with knowledge of these transactions, which the least diligence and inquiry on his part would have made known to him, and it is unnecessary to reiterate that the rights of the plaintiff have intervened during his long withdrawal from interest in the Building Company's affairs.

The case of Chestnut St. Trust & Savings Fund Co. v. Record Publishing Co., 227 Pa. 235, 75 Atl. 1067, 1068, 136 Am. St. Rep. 874, is an excellent example of the view taken by the courts concerning such a situation as is here presented. There it appeared that the directors and stockholders of a corporation permitted its president to have full management of all corporation affairs and to exercise complete control thereof over a period of many years, unrestrained. The corporation was held liable on its note given by the president without express authority from the directors, or subsequent ratification, although the corporation received no benefit from the proceeds, the president using them for his own purposes, the note having been delivered to one who paid full value, without knowledge of the president's wrongful intent. Relative to the authority of the president to bind the corporation, the court pointedly said:

"Where the stockholders and directors turn over to an officer the full and absolute management of all corporation affairs, and permit him to exercise unrestrained control for a long course of time without instructions from or reference to any other authority, *prima facie* the officer so intrusted may be taken to have power to do any act which the directors could authorize or ratify."

After a careful and painstaking examination of the record, the authorities and arguments of the parties herein, we are quite unable to see that the trial court was in error in entering the decree it did, and that decree must be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.