## PALMETTO LUMBER CO. et al. v. GIBBS et al.

### No. 2111.

Court of Civil Appeals of Texas. Beaumont.
May 12, 1932.

Rehearing Denied June 22, 1932.

W. J. Howard, Andrews, Streetman, Logue & Mobley, Chas. C. McRae, and Homer Mabry, all of Houston, for appellants.

Dean & Humphrey, of Huntsville, and Baker, Botts, Andrews & Wharton, of Houston, for appellees.

WALKER J.

This was an action for accounting and to recover the title and possession of 6,493.05 acres of land situated in Jasper and Newton counties, filed on the 17th day of May, 1927, by appellants, Palmetto Lumber Company, hereinafter referred to as lumber company, A. C. Ford, R. W. Miller, and A. L. Black, as plaintiffs, against appellees, holders of the estate of Mrs. Sallie E. Gibbs, deceased, J. P. Gibbs, the estate of W. S. Gibbs, deceased, the estate of T. C. Gibbs, deceased, H. Y. Robinson and his wife, Alla G. Robinson, O. L. Norsworthy and his wife, Sanford G. Norsworthy, H. Hawley and his wife, Leota G. Hawley, J. P. Gibbs and J. V. Butler, independent executors of the last will of W. S. Gibbs and T. C. Gibbs, deceased, and Gibbs Bros., a copartnership composed of appellees, as above named. After the filing of the suit, the death of H. Y. Robinson was suggested, and his heirs made themselves parties defendant, and are appellees herein. The trial was to the court without a jury, with judgment in favor of appellants against appellees for $10,129.84 on the issue of accounting, but in favor of appellees on the issue of title to the land. Conclusions of fact and law were filed in support of the judgment. Appellants

complain of the judgment against them, both on the issue of accounting and on the issue of title, under the following propositions:

The action for the land was in the nature of trespass to try title. The lumber company bought the land in controversy and 3,000 acres of timber adjacent thereto from George W. Carroll, and then deeded the land to Mrs. Sallie E. Gibbs on the 3d of October, 1907. After negotiating for some time with Mr. Carroll to buy this land and timber, on April 4, 1907, appellant A. C. Ford, as president of the lumber company, wrote to W. S. Gibbs, the general manager of the business of his mother, Mrs. Sallie E. Gibbs, through whom appellees hold, the following letter: "I got a phone report this afternoon from Black & Hardesty on the timber in Newton County. * * * There seems to be quite a good deal more timber that can be gotten in that locality at from $1.50 to $2.00 per M, buying land and timber. I want you to go in with me and help me buy it for the Palmetto Lumber Company. I will make you this proposition on it. If you will advance us the initial payment of $50,000.00 we will pay you 8% interest on the loan, you to arrange to carry it for at least two years. We will also deed. you the land amounting to 7,000 acres after timber is removed. If I can arrange for the initial payment I can arrange in a very short while—not over 4 months to bond the whole proposition for the entire amount including the timber in the bend, and pay back the money borrowed from you as well as pay you cash for the timber in the bend & I think I can borrow the money from the bank—but I don't want to risk that."

The purchase of the land and timber from Mr. Carroll was made by the lumber company with money advanced by Mrs. Gibbs under the conditions of this letter, except it was necessary for her to advance in cash only $47,643.75; and, on the conditions of the letter, the lumber company deeded her the land. At that time the land had a value of $2 per acre. The facts of the sale were pleaded by appellants, but they did not pray for the cancellation of the deed from the lumber company to Mrs. Gibbs. The theory of the petition was that the deed was absolutely void because the only consideration paid by Mrs. Gibbs for the land was the usurious interest on the $47,643.75. The trial court found that the interest so paid was usurious, but denied them recovery on the legal conclusion that the deed from the lumber company to Mrs. Gibbs, though executed upon a usurious consideration, was not void, but only voidable. If we correctly understand appellants' contentions, they concede that the judgment denying them recovery for the land was correct, provided the deed was only voidable and not absolutely void; that is, if it was necessary to cancel the deed, they could not recover the land because they had no prayer for its cancellation.

They state their contention as follows: "The only question arising is, was said deed void in the sense that it failed to divest the Lumber Company of the title to the land herein described and permit of the said Lumber Company recovering such land without first having the deed set aside?"

Appellants base their contention that the deed was absolutely void upon article 5069, R. S. 1925, which defines usury and provides that "all contracts for usury are contrary to public policy and shall be void." This article does not support their proposition. It outlaws only executory contracts and not executed contracts such as the one at bar. Under the admitted facts, every element of the usurious contract under which Mrs. Gibbs acquired title to this land had been fully executed. Such contracts do not fall within the provisions of article 5069, but to have relief the complaining party must resort to an affirmative action, either for the cancellation of the deed or for the recovery of the value of the land under article 5073, which provides that "within two years after the time that a greater rate of interest than 10 % shall have been received or collected upon any contract, the person paying the same, or his legal representative, may by an action of debt recover double the amount of such interest from the person, firm or corporation receiving the same." Appellants rely upon Shear Co. v. Hall (Tex. Com. App.) 235 S. W. 195. As we construe that case, it is not at all in point on the facts of this case, in that the sale there construed as void "was made under the terms of a deed of trust securing a usurious loan," and hence fell exactly within the provisions of article 5069. While our statutes outlaw usurious contracts, they do not inhibit the payment of usurious debts. The payment of such debts operates to discharge them in full, and the title to the money or property used as a medium of payment passes to the payee. Thus in Hicks v. Marshall, 67 Ga. 713, it was said: "A debtor may pay a usurious debt as well as any other, and he may pay it in money or he may pay it in land." Again, in Harris v. Hull, 70 Ga. 831, it was held that a deed, given in payment of a usurious debt, was a valid payment of the debt and that conclusion could follow only upon the theory that the creditor acquired title to the land. Though all the consideration for the deed was usurious interest, it was not void in the sense contended for by appellants, but was merely voidable. Under McCampbell v. Durst, 15 Tex. Civ. App. 522, 40 S. W. 315, appellants could not recover the land without first having a cancellation of this deed, which relief was not prayed for in the petition.

The judgment on the issue of title to the land is in all things affirmed.

In addition to the $47,643.75, borrowed from

Mrs. Gibbs, as the cash payment for the Carroll land and timber, the lumber company assumed notes and executed new notes in an additional amount of approximately $113,000, representing the balance of the purchase price of the Carroll land and timber. During the years immediately following this purchase, the lumber company was not able to repay Mrs. Gibbs the money borrowed from her, nor to pay the notes executed and assumed by it in payment of the balance of the purchase price. So, to protect her loan against this land and timber, Mrs. Gibbs was forced to take up all the outstanding notes as they matured, except one small note, until by 1910 the lumber company owed her $196,750. On December 6, 1910, the lumber company, by general warranty deeds conveyed to Mrs. Gibbs the Carroll timber and certain other timber in San Jacinto county. Contemporaneously with the execution and delivery of these deeds the parties entered into the following selling contract involving the timber covered by these deeds: It was recited that by the deeds the lumber company had sold the timber to Mrs. Gibbs, and that the timber so sold amounted to 78,700,000 feet, for which Mrs. Gibbs was paying $2.50 per thousand, amounting to $196,750; that Mrs. Gibbs had offered and promised to pay the lumber company upon the resale of the timber within ten years from the 2d of November, 1910, half the difference between the selling price of the timber and its cost to her, including taxes and carrying charges, etc., with interest at the rate of 10 per cent. per annum, upon condition that the lumber company would guarantee to her, upon such resale, that the timber would sell for enough to pay cost, taxes, carrying charges, etc., with interest at 10 per cent. per annum. On the conditions stated, the lumber company guaranteed to Mrs. Gibbs that upon the resale of the timber within 10 years from the 2d of November, 1910, she would realize her different cost items with interest, and, on consideration of the guaranty thus made by the lumber company Mrs. Gibbs promised and agreed to pay over to the lumber company, upon the resale of the timber, one-half of the net profits calculated upon the basis of the return to her of her investment with 10 per cent. interest, and, further, (a) that she would not make a sale of the timber within three years from the 2d of November, 1910, except at a price satisfactory to the lumber company; (b) that she would sell the timber at the request of the lumber company at any time within two years from the 2d of November, 1910, at $3 per thousand; (c) that at any time within three years she would sell the timber at $3.25 per thousand at the request of the lumber company; (d) that for six months after the expiration of the three years she would not sell the timber for less than the guaranty of the lumber company; (e) that within six and one-

half years from the expiration of the three and one-half years the timber would be sold and an account rendered to the lumber company for the purpose of adjustment under the guaranty; (f) after the expiration of three and one-half years from the 2d of November, 1910, Mrs. Gibbs was given the absolute right to sell the timber at a price which she considered "the then fair value of said timber," and the guaranty of the lumber company was to cover the shortage, if any; (g) within three and one-half years from the 2d of November, 1910, the lumber company was given the right to buy back the San Jacinto county timber at $2.50 per thousand with taxes, carrying charges, etc., with interest at 10 per cent. per annum; (h) after making a sale of all timber for which she could find a market, any timber remaining on the land for which she could not find a market was to be held by Mrs. Gibbs "as freed from the terms of this contract."

The timber conveyances and the contract were executed under resolutions of the board of directors of the lumber company, as recited in the contract. These resolutions bear date as of the 2d of November, 1910, and recite that a meeting of the board was held on that date, called for the purpose of authorizing the "sale of the timber" to Mrs. Gibbs; that she had proposed to "buy the timber from the lumber company"; that she was offering to "pay" for the timber $2.50 per thousand, the purchase money to apply on the indebtedness of the lumber company to her; that she was willing to divide the profits from the subsequent sale of the timber on the basis as recited in the contract, provided the lumber company would execute to her the guaranty as recited in the contract; that it appeared to the board that the lumber company was not "now" in position to manufacture the timber into lumber, and that "it probably would not be practicable for it to manufacture into lumber at any time" the said timber; that it was now paying heavy interest charges on its indebtedness for the purchase price of said timber; that it was to the best interest of the stockholders of the lumber company to make "sale" of said timber to Mrs. Gibbs. On the foregoing recitations, the following resolutions were passed by the board: "It is therefore ordered by the said board of directors, all of whom are present, and all voting in the affirmative, that said Palmetto Lumber Company make sale of its said pine and oak timber to the said Mrs. Sallie E. Gibbs for the consideration aforesaid, said timber being situated upon the following designated tracts of land, to wit: * * *" and, further, that the lumber company enter into the agreement, in substance, as stated in the contract, and further: "It is further ordered that said A. C. Ford, president of said Palmetto Lumber Company, shall execute in the name of said Palmetto Lumber Company, to the said Mrs.

Sallie E. Gibbs, suitable conveyance or conveyances for the consideration aforesaid, said conveyance or conveyances to be general warranty deeds of the said Palmetto Lumber Company, and guaranteeing that the quantity of said timber ten (10) inches and up at the stump now equals 78,700,000 feet; and the said A. C. Ford, president of the said Palmetto Lumber Company, is also authorized and instructed, in the name of the said company, to enter into a contract of guaranty with the said Mrs. Sallie E. Gibbs in which the said Palmetto Lumber Company shall guarantee that upon a resale of said timber the said Mrs. Sallie E. Gibbs shall realize at least $2.50 per thousand feet which she is paying therefor, and also all carrying charges, including taxes, and other expenses actually paid, and 10 per cent per annum on her investment and the expenses so paid, and, as a consideration for said guaranty, the said Mrs. Sallie E. Gibbs is to agree to pay over to the said Palmetto Lumber Company an equal one-half of all of the net proceeds which she may realize upon the resale of said timber, or any part thereof. The said A. C. Ford, president of the said Palmetto Lumber Company, is hereby fully authorized and empowered in the name of the said Palmetto Lumber Company, to couch said deeds and contracts in such language and terms as he may see fit and proper to carry into full effect the said sale and other contracts hereinafter authorized."

Because these resolutions provided only for the sale of the pine and oak, while it was the intention of the parties that the conveyances should cover all timber standing upon the land described in the resolutions, another resolution was duly passed authorizing the inclusion within the contract of all timber on the land.

Appellants contended in the court below, and renew this contention here, that, notwithstanding their affirmative recitations, these timber conveyances and the contract executed contemporaneously with them, construed in the light of the extraneous testimony, evidenced only a mortgage and renewal extension of the existing indebtedness of the lumber company to Mrs. Gibbs. This is one of their principal contentions, for, if these transactions evidenced a mortgage, then, on the issue of accounting, there was available to them the defense of usury against the claim for interest on the original loan from 1907 and the renewal of all the loans, in the aggregate sum of $196,750, from December 6, 1910. The interest of the lumber company in the proposition is manifest from the statement already made. The interest of Ford, Miller, and Black arose under a subsequent contract whereby they were to share in the profits. On this issue the trial court found:

"I find that the 1910 deed and contract was, at the time of its execution and delivery, intended by the parties to be and was a bona fide sale of the timber on the one hand and purchase on the other, both parties intending that the title to the timber should, under and by virtue of said instruments, pass absolutely to Mrs. Sallie E. Gibbs, and I further find that both parties, down to the year 1926, treated said deed and contract as having such effect. And I further find that said instruments in all their terms represent the true intention and purpose of the parties thereto; that by the execution and delivery of the deed and contract of December 6, 1910, the said indebtedness of $196,750.00 including the loan by Mrs. Sallie E. Gibbs to the Palmetto Lumber Company of $47,643.75 going to make the initial or cash payment on the purchase of the Carroll lands, together with its accrued interest, was fully paid off and discharged and that the parties thereto so intended and so understood this to be the effect of the transaction and so treated it throughout the years until it was questioned for the first time by the Palmetto Lumber Company a short while before the filing of this suit. I find that at the time the said deed and contract passed that Mrs. Sallie E. Gibbs caused to be made entries on her books charging her with the receipt from Palmetto Lumber Company of said $196,750.00, and that the Palmetto Lumber Company caused to be made on its books corresponding entries crediting itself with the payment to Mrs. Sallie E. Gibbs of said indebtedness, and that these entries so stood to the end of the venture.

"I further find, after the execution of said deed and contract, that neither Mrs. Sallie E. Gibbs, nor her successors in interest, Gibbs Bros. & Company, ever made any claim or demand on the Palmetto Lumber Company to pay said indebtedness or any part thereof, nor was any interest ever demanded thereon by Mrs. Sallie E. Gibbs or her successors in interest and title and I find that the Palmetto Lumber Company, after said timber, never paid or offered to pay to the Gibbses said indebtedness or any part thereof, nor did they tender to pay them any interest thereon."

■ Appellants attack these findings by saying (a) under all the evidence the intention of the parties was that these instruments should evidence a mortgage; (b) the finding of a sale by the trial court was against the great weight and preponderance of the evidence; and (c) the instruments, on their face, evidenced a mortgage. All these contentions are overruled.

The facts recited by the court, upon which he based his conclusion that the deeds and contract evidenced an absolute sale of the timber, were clearly established. Mr. Ford, the president of the lumber company, and who represented it in these transactions, testified on this issue: "The debt was wiped out on our books and it was my understanding that the debt was paid but our guaranty still stood.

up. * * * For sixteen years we treated the 1910 contract as a sale, according to our book records. Our attorneys found it was not a sale, and I didn't know what the legal effect of it was until they told me." Appellees always gave these deeds an absolute construction.

It would serve no useful purpose to review further the immense volume of extraneous evidence offered by both parties to ascertain the intent of the parties in executing the deeds and contract. As far as this evidence is concerned, it raised the issue, and sustained the court's finding thereon, that these deeds were executed for the purpose of conveying to Mrs. Gibbs the absolute title to the timber described in the deeds, and that she accepted the deeds and joined in the execution of the contract with the intent of canceling the indebtedness she held against the lumber company to the extent of $196,750.

■ Appellants did not pray for reformation of the deeds and contract, but introduced extraneous evidence only as an aid in their construction. If the extraneous evidence does not compel a construction that the deeds and contract were executed as a mortgage, then appellants agree with appellees that the trial court correctly concluded "that said instruments, in all their terms, represent the true intention and purpose of the parties thereto." This proposition takes out of the case all theories of ambiguity in the language of the instruments and leaves nothing to be determined except their proper legal construction. While it is the law that an instrument, in form an absolute deed, may be shown by extraneous evidence to be a mortgage, appellants correctly assert that an instrument, in form a mortgage, may not be shown, upon the construction of its terms and conditions in the light of extraneous evidence, to be an absolute deed; upon that issue the language of the instrument must control.

■ Upon this proposition, it is appellants' contention that the guaranty clause of the contract, as a matter of law, made the entire transaction a mortgage; that is, that the deeds and contract by their express language carried forward as binding obligations the indebtedness of $196,750, and, in so far as they effect the timber, the instruments merely evidenced a renewal and extension of the liens held by Mrs. Gibbs to secure her indebtedness. Kraemer v. Adelsberger, 122 N. Y. 467, 25 N. E. 859, is appellants' principal case to sustain their construction of these instruments. That case is not in point because there the original debt was not canceled but was carried forward as a continuing debt. They also cite the following additional authorities, which may be distinguished upon the same grounds: Border Nat. Bank v. American Nat. Bank (C. C. A.) 282 F. 73; Ruffier v. Womack, 30 Tex. 332; Calder v. Ramsey, 66 Tex. 219, 18

S. W. 502; Lessing v. Grimland, 74 Tex. 239, 11 S. W. 1095; Tittle v. Vanleer, 89 Tex. 179, 29 S. W. 1065, 34 S. W. 715, 37 L. R. A. 337; Watson v. Beall (Tex. Civ. App.) 279 S. W. 543; Alstin's Ex'r v. Cundiff, 52 Tex. 462; Miller v. Yturria, 69 Tex. 555, 7 S. W. 206; Peters, etc., Co. v. Schoelkopf, 71 Tex. 420, 9 S. W. 336. In all the cases cited by appellants, as we understand them, the renewal and recognition of the existing indebtedness was not deduced from the language of the guaranty, as a guaranty, but from all the language of the instruments in issue. We think the deeds and contract in issue in this case must be construed from principles clearly distinguishable from the authorities relied upon by appellants. As we understand the language of the instruments before us, they evidenced, first, an absolute sale and conveyance of the timber and the cancellation of the indebtedness of the lumber company to Mrs. Gibbs, and, second, a guaranty by appellants upon a valid consideration, independent of the conveyance of the timber and cancellation of the indebtedness. As thus construed, the guaranty conditions of the contract did not make the transaction a mortgage. The following authorities, some of which are almost on all fours with the facts of this case, clearly sustain our construction of the language of these instruments: Orvis v. Curtiss, 157 N. Y. 657, 52 N. E. 690, 68 Am. St. Rep. 810; Manasse v. Dinkelspiel, 68 Cal. 404, 9 P. 547; Baker v. Thrasher, 4 Denio (N. Y.) 493; Bacheller v. Bacheller, 144 Ill. 471, 33 N. E. 24; Stollenwerck v. Marks & Gayle, 188 Ala. 587, 65 So. 1024, 1025, Ann. Cas. 1917C, 981; Floyd v. Harrison, 2 Rob. (Va.) 161. We adopt as correct the court's fact conclusions copied above, to the effect that Mrs. Gibbs acquired title to the timber.

■ The conclusion that these deeds conveyed to Mrs. Gibbs the absolute title to the timber also overrules all claims for usury arising on December 6, 1910, and prior thereto, because all such claims were settled by the sale of the timber.

■ The 1910 contract initiated a joint venture between appellees and the lumber company for the purpose of selling the timber described in the contract and deeds, which was subsequently extended and changed by the parties and not concluded until April, 1927. After the execution of the 1910 contract, though the parties tried to sell the timber, they were not able to find a purchaser. Finally, on the 22d of December, 1915, on the advice of the lumber company, Mrs. Gibbs contracted with E. A. Oualline to cut and manufacture into lumber some of the Carroll timber and other timber owned by her adjacent to the Carroll timber. Oualline immediately entered upon the execution of this contract by erecting a sawmill at Jasper on property owned by Mrs. Gibbs, and by cutting and manufacturing into lumber some of the tim-

ber covered by his contract. In 1917 Mrs. Gibbs, on the advice of the lumber company, erected for Oualline at his Jasper mill certain improvements necessary for the more profitable operation of the mill plant, at a cost to her of about $35,000, in which she was protected by a supplemental contract with Oualline. But Oualline was unable to make a success of his venture, and in April, 1918, with the consent of Mrs. Gibbs, sold his mill and his contract to the lumber company, who assumed all the obligations owed by him to Mrs. Gibbs. After the lumber company bought out the interest of Oualline, it entered into a written contract with Mrs. Gibbs for the manufacture of the Carroll timber and other timber which she might acquire adjacent to the Carroll timber, to which Ford, its president, and Miller and Black, two of its directors, were parties. Under this contract Ford, Miller, and Black were to receive 20 per cent. of the net profits of the venture as compensation for personal services to be rendered by them. This contract was dated April 25, 1918. In relation to this contract and the subsequent conduct of the joint venture, the court made the following finding: "I find the papers referred to above (contract April 25, 1918) were probably only executed as between Palmetto Lumber Company and Gibbs Bros. & Company as a matter of convenience for the purposes of simplifying such transfer of title and operations, but further find that if such instruments at the time of their execution in fact represented bona fide contracts and agreements as between the Palmetto Lumber Company and Gibbs Bros. & Company, I then find that almost immediately after their execution they were as between Gibbs Bros. & Company and the Palmetto Lumber Company wholly abandoned, set aside, and by mutual agreement of the parties were never carried out or attempted to be carried out from the beginning and that in lieu of the written contracts they mutually substituted oral agreements to carry on the manufacture of lumber from the lands described in the Oualline contract," etc.

It was further found that Mrs. Gibbs was to have the right to market the products of the joint venture and to collect and pay out all money due it, and that she was to charge herself with interest at 10 per cent. per annum, compounded annually, upon all funds of the joint venture coming into her hands. From December 6, 1910, appellees kept the books and accounts of the joint venture. After Oualline sold out, they conducted the business under five different accounts, but on the advice and urgent insistence of appellants consolidated all these accounts into one account as of date December 31, 1921, showing a net balance due them of $410,211.45.

From the date of the 1910 contract to January 1, 1916, appellees charged against their investments under that contract simple interest at the rate of 10 per cent. per annum,

but from January 1, 1916, to December 31, 1921, interest was charged thereon at the rate of 10 per cent. per annum, compounded annually. The court found that prior to December 31, 1915, the lumber company and appellees verbally changed the interest provisions of the 1910 contract from simple to compound interest, thereby finding in appellees' favor on this interest item as charged into the consolidated account of December 31, 1921. Appellants vigorously attack this finding, and also the finding copied above that the parties abandoned the written contract of April 25, 1918, and operated the joint venture under a verbal contract. These findings have abundant support in the record.

Mr. Ford, as president of the lumber company, knew the exact details of all interest charges made by appellees. With this information, in 1921 he asked for a complete statement of all accounts kept by appellees against the joint venture, and that these accounts be consolidated into one account, which was done, as stated above, as of date December 31, 1921. This consolidated account showed all interest charges made by appellees, and that the interest rate under the 1910 contract was changed as of date January 1, 1916, from simple to compound interest. The statement of the interest account was known not only to Mr. Ford, the president of the lumber company, but to appellants Miller and Black, two of his principal directors. With this detailed information, Ford, acting for the lumber company, and Miller and Black, accepted and approved the consolidated account in every item and duly entered it upon the books of the lumber company. After the consolidation of the accounts as of date December 31, 1921, appellees charged interest in their favor on this investment of 1910 at the rate of 10 per cent. per annum, compounded annually, just as they did in consolidating the account. Ford, Miller, and Black knew of this interest charge and the manner in which the interest was being compounded upon the investment of 1910 at all times up to the end of the venture in April, 1927, and neither of them, nor the lumber company, nor any one for the lumber company, ever entered a protest against it until about the time the mill was closed down in August, 1926. The extent of Mr. Ford's knowledge is shown by his letter dated September 5, 1921, when he stated that interest was to be computed at the same rate against both the debits and the credits, and it was conceded that the credits were properly charged with compound interest. In 1922 or 1923, discussing the value of certain timber that entered into the account, Mr. Ford said, as testified to by Mr. Oliphint, that he was glad the account did not include any increased value of the timber, "that 10% compound interest was bad enough on that account without getting any enhanced value in

there." On February 7, 1922, Mr. Ford wrote appellees for a statement of the cost of the Carroll timber and certain other timber. This statement was furnished on February 10, 1922, and included interest on the cost price of all timber listed at 10 per cent. per annum compounded annually, and neither he nor any one for the lumber company made any protest against this statement. In this connection it should be said that Mr. Ford denied that he ever agreed with appellees to change the interest rate of the 1910 contract, but admitted that he never protested against the interest charges. W. S. Gibbs, who was the manager of his mother's business and conducted all business relations with Mr. Ford, died in 1921, and was succeeded in the management by his brother, T. C. Gibbs, who continued the management and business relations with Mr. Ford until his death in 1926. The correspondence between Mr. Ford and W. S. and T. C. Gibbs showed the warmest appreciation by him of the financial assistance they were giving his company. From the beginning of this correspondence there is not a suggestion from Mr. Ford of a mistake in the interest charges, but, as said above, he expressed many times the sincerest appreciation of the favors they were extending him. The facts, as summarized, sustain the court's finding that prior to January 1, 1916, the parties changed the interest rate of the 1910 contract from simple to compound interest. That they had the legal right to make this change cannot be questioned unless inhibited by the statute of frauds. The rule was thus stated in Groce v. P. B. Yates Mach. Co. (Tex. Com. App.) 288 S. W. 161, 162: "The power to modify or rescind a pre-existing agreement is co-extensive with the power to initiate it. * * * Except in cases within the statute of frauds, etc., the modification or rescission may rest in parol."

■ The fact of modification is subject to the same rules of proof as other facts in civil cases; that is, it is subject to proof by direct testimony or it may be implied from the conduct of the parties and from the facts and circumstances· in evidence in the case, explaining the dealings of the parties.

Even on the theory of circumstantial evidence, we think the circumstances in the case imperatively demanded the conclusion by the court that the interest rate was changed. But we do not review appellees' proposition that the court's conclusion must be tested by the rules of circumstantial evidence because, as shown by the statement made above, this conclusion had abundant support in positive and direct testimony. Therefore the authorities relied upon by appellants under the theory of circumstantial evidence have no application.

■ Though the parties and the court called the compensation allowed Mrs. Gibbs for the use of the money advanced to the joint venture "interest," it was not such in the strict meaning of that term, but was only a share of the profits of the joint venture, and therefore not within the usury laws. Duffy v. Gilmore, 202 Pa. 444, 51 A. 1026. So the authorities, cited by appellants to the effect that contracts to pay compound interest are not favored by the courts, are not in point. And all propositions of usury against the 1910 contract must be overruled.

Again, appellants say that Mr. Ford's acquiescence in this interest charge can·be explained upon a misunderstanding by him and W. S. Gibbs of the interest conditions of the 1910 contract, that is, that both he and W. S. Gibbs construed this contract as calling for compound interest, and, further, that it can be said that the evidence shows only an acquiescence in the charge after it was made and not an agreement to the charge before it was made. In answering these contentions, we say that the issue was raised that Mr. Ford at all times had a clear understanding of the interest provisions of the 1910 contract. Also we say that the facts, as will be reflected by our statement in support of subsequent propositions, show that appellees assumed vast financial burdens and performed valuable personal services in the execution of the joint venture on the faith of this interest charge that they would not otherwise have assumed and performed. The evidence clearly raised the issue that the change in the interest rate was contractual and of the date found by the court.

■ We cannot agree with appellants that the acts and conduct of Mr. Ford, in acquiescing in this interest charge and in writing letters acknowledging its justness, were mere legal conclusions by him in the construction of the 1910 contract, for, as said above, the issue was raised against him that he knew that the 1910 contract called only for simple interest. Appellants incorrectly assert that the circumstances enumerated above were not evidentiary on the issue of change in the 1910 contract. We find nothing in the record even suggesting that Mr. Ford dealt with this account in the belief that, on final settlement, the compound interest on the 1910 contract would be taken out of the account. On the contrary, all the evidence is to the effect that he accepted this charge as a final disposition of this interest item. Nor can we agree with appellants' proposition that Mr. Ford's positive testimony that he never agreed to a change in the interest rate of the 1910 contract must determine the disposition of this issue. That he agreed with his intimate friends and joint adventurers, W. S. ·and T. C. Gibbs, for eleven years in this interest charge and never entered a protest until after their death so weakened his testimony on this issue that the trial court was not compelled, as a matter of law, to believe him.

There is no merit in the contention that the contract found by the court, changing the interest provisions of the 1910 contract, was in violation of the statute of frauds, in that (a) it was not to be performed within a year, because, for many other reasons, the contract as found by the court had been duly executed, and it is the law, 27 C. J. 323, that "when an oral contract, not to be performed within one year, has been duly executed by both parties, the validity of the agreement and of the acts done under it can not be questioned." (b) Again it is contended that the contract involved a sale of real estate. Appellants erroneously construe the contract of 1910. In so far as it involved a joint venture between appellees and appellants, it was not a contract for the sale of real estate, but only an agreement to share profits arising from its sale, and as such was not within the statute of frauds. Martin v. Morrison (Tex. Civ. App.) 260 S. W. 893; Lincoln v. Kirk (Tex. Civ. App.) 243 S. W. 671. also, there is no merit in the contention that the contract, as found by the court, was without consideration. The facts, as we have found them, fully sustained the court's finding against this assignment.

The contract, under which the joint venture was prosecuted and finally concluded, was so contrary to and against the written conditions of the contract of April 25, 1918, that the trial court was justified in finding that it was abandoned immediately after its execution and the joint venture prosecuted under an oral contract. The following facts bear on this issue: The 1918 contract dealt with the lumber company as the owner of the sawmill, including trams, roads, etc., and at its expense it was to cut and transport the timber to the mill, manufacture it into lumber, stack and load out the lumber for shipment, etc.; it was to purchase the steel, kilns, steam plants, and sheds and all other property which Mrs. Gibbs had furnished to Oualline. Though these conditions were written into the contract of April 25, 1918, the record is clear that the intent of the parties was that the lumber company was not to perform them. Further, a note for $70,000 was given by the lumber company to Mrs. Gibbs for the money paid Oualline, but it was understood from the beginning that this note was a charge against the joint venture and not a charge against the lumber company. After appellees introduced the $70,000 note in evidence, Mr. Ford testified as follows: "This is the note I signed. That was not an indebtedness of the Palmetto Lumber Company, as an obligation directly of the company in its individual capacity."

Explaining further the contract under which the joint venture was operated, this witness said: "I tell the court further that the conduct of the parties is what governs in that and the letters that went with it."

It thus appears, contrary to the provisions of the 1918 contract, that the lumber company was never obligated to pay the $70,000 note, nor to buy and pay for the steel, kilns, and mill site, nor to pay the cost of operating the mill. Again, under the contract of April 25, 1918, appellees agreed to pay the lumber company for its services in manufacturing the timber into lumber the same compensation that Oualline was to receive. The evidence shows that this element of the contract was abandoned and not acted upon by the parties. Even the money stolen by employees of the lumber company was furnished by appellees, and the lumber company made no pretense of refunding it. The fact is that the lumber company did not perform, and made no pretense of performing, and financially was unable to perform, vitally important obligations assumed by it in the 1918 contract. This short summary of the facts sustains the conclusion that the 1918 contract was abandoned immediately after its execution and was never intended to control and govern the joint venture.

In addition to the Carroll timber, appellees put into the joint venture the Horger and McMahon timber and other timber bought by them, amounting to about 34,000,000 feet. To this timber was subsequently added by appellees 8,000,000 feet of standing timber and about 8,000,000 feet of logs purchased after December 31, 1921. Prior to the consolidation of the accounts as of December 31, 1921, this timber had not been charged to the lumber company timber account, but had been kept in an account book called "Gibbs Bros. country real estate and land book," commonly referred to as "country real estate-timber." The cost of this timber as of date the 10th day of February, 1922, was $63,051.54 and the interest on the cost as of that date, calculated at the rate of 10 per cent. per annum, compounded annually, amounted to $78,420.84. When the accounts were consolidated, this interest item was not carried into the consolidated account because it was not believed by the parties at that time that the venture would show a profit, and they agreed, for income tax purposes, that this item should be omitted. It was the contention of appellees that the additional timber was not put into the joint venture until the consolidation of the accounts in 1922, and then by an oral agreement that they were to have cost, taxes, and carrying charges, etc., with interest at 10 per cent. per annum, compounded annually, and that the interest item of $78,420.84 was to be carried as a liability against the joint venture, and, if a sufficient profit was made, it was to be repaid to them with interest thereon at 10 per cent. per annum, compounded annually; while appellants contended that the timber was to be put into the joint venture under the terms of an oral agreement made just prior to the execu-

tion of the Oualline contract, and that cost, taxes, and carrying charges were to be repaid appellees with simple interest at 10 per cent. per annum. The trial court found with appellants that the oral contract covering the timber was made prior to December 22, 1915, but found with appellees that they were to be paid 10 per cent. per annum, compounded annually, on costs, taxes, carrying charges, etc., and further that the interest item of $78,420.-84 was to be carried as a liability of the joint venture and to be repaid with interest at 10 per cent. per annum, compounded annually. So far as this finding is against their contentions, appellants attack it as being without support in the evidence. This attack is denied. Mr. Ford admitted that he knew of this interest statement as a part of the consolidated account and that it was calculated upon the basis of 10 per cent. per annum compound interest. At the time of the consolidation of the accounts he made no protest against this interest charge. J. W. Oliphint testified for appellees that Mr. Ford worked with him in his office two days in the latter part of January, 1922, in preparing this timber statement and the interest thereon, and Mr. T. C. Gibbs was with them all the time and Judge Dean part of the time. The following testimony of this witness bears directly on this issue:

"I had completed that work and had it before (us) at the January meeting, 1922. Mr. T. C. Gibbs and Mr. A. C. Ford, at the December, 1921, meeting, when Mr. Fuller was with us, told me to get up a statement of all Gibbs Bros. & Company country real estate pine timber that was owned in Newton and Jasper Counties, owned by Gibbs Bros. & Company, and incorporate that in a statement figuring the exact cost of the timber in each and every instance and figuring up 10 per cent compound interest on that cost from the date of purchase down to December 31, 1921, and also to figure up a statement of the taxes on each and every tract of that timber from the time the first taxes were paid on each and every tract down through 1921 with 10 per cent compound interest on that and also the carrying charges incurred in connection with all work done with that timber. This statement (referring to Defendants' Ex. 640) was prepared under those instructions from both of those two gentlemen and the statement shows the date of the purchase of each tract and the land identified by abstract and original grantee and the acres and the exact cost and on that exact cost interest was figured at 10 per cent compound interest from the date of purchase down through December 31, 1921. At the January meeting Mr. Ford returned to Huntsville and I went through this statement in detail with him and Mr. T. C. Gibbs."

The witness then testified that he went over the statement in connection with the land book with Mr. Gibbs and Mr. Ford and explained to them in detail how the statement was prepared. "Mr. Ford figured personally the cost of the country real estate timber—he figured it in my office on the first day's conference, taking the total amount down on the exhibit as the cost and including those costs of the fee-simple title only and applying to that the estimate which we had of the country real estate timber. The estimate of the timber covered by the land involved in this Exhibit 640 amounts to approximately 34,-000,000 ft. The cost, original cost, of that timber, plus the cost of the land about which I have testified where money was paid out for land only was $63,061.54 and the accumulated interest, 10 per cent compound, on all of this initial costs amounted to the sum of $78,420.84. The sum of these two items being $141,482.38. The 34,000,000 ft. approximately divided into that total gives a cost price reflected from the standpoint of actual cost, plus 10 per cent compound interest, of $4.16 per thousand."

Again he testified:

"I have testified that Mr. Ford, in my office, made a calculation of the cost of Country Real Estate timber. After he had made that calculation we had already been dealing with the Palmetto Lumber Company timber account timber under the Carroll purchase and had made an estimate of what that timber cost per thousand, and Mr. Ford said that this was very much cheaper timber, even including the 10 per cent compound interest, than the Carroll timber was.

"Now, with reference to the $78,420.84, shown on Defendants' Exhibit No. 640, as computed interest on the Country Real Estate timber. After that Country Real Estate matter had been passed on thoroughly by Mr. Ford and Mr. Gibbs, they called Mr. Vinson into my office and had that put on the cash book, both the original cost of the timber and the interest. After all of the consolidated entries had been figured up and put on the books, and the general result of that consolidation shown to Mr. Dean, Mr. Dean advised all of us that, in his judgment, it would not be best to leave that $78,420.84 interest on the books; that under our method of accounting to the Government for income taxes we would have to pay income tax on that amount for the year 1921. Both of them, both Mr. T. C. Gibbs and Mr. Ford, said they did not believe the proposition would pay out with the amount of timber that was left to cut, and including at that time the $78,000.00 interest, and on Mr. Dean's recommendation it was scratched from the books after Mr. Vinson had been called into my office and entered it on his cash book. That advice was given by Mr. Dean in my office and I was present and Mr. T. C. Gibbs was present and Mr. A. C. Ford was present."

**130**

While Mr. Ford denied the facts testified to by Mr. Oliphint, the credibility of his testimony rested with the court. On February 21, 1925, Mr. T. C. Gibbs wrote Mr. Ford a letter directing his attention to this interest charge and reminding him of the circumstances under which it was omitted from the consolidation account at the time of the consolidation, and telling him that, according to his understanding, this was one of the items which was yet to be charged into the account, together with "interest on it and interest on the open account to this date." On March 2, 1925, Mr. Ford replied to this letter as follows: "Replying now to yours of the 21st relative to the statement of Jasper Investment account. As far as I can see, your letter recites clearly the condition of the account as it should appear on our books. * * * Under the terms of your contract with the Palmetto Lumber Company you have the right, therefore, to debit back this amount and take out of the final settlement $78,000.00, with interest from January 1, 1922, to this date."

We think the quoted testimony fully supports the trial court's conclusion that "the country real estate" of appellees was put into the joint venture on condition that appellees were to be repaid its original cost, taxes, carrying charges, etc., with interest at 10 per cent. per annum, compounded annually.

During 1913 and 1914 the lumber company, under the conditions of the 1910 contract, made the necessary arrangements with appellees to manufacture into lumber the timber covered by this contract situated in San Jacinto county. The manufacture of this timber was undertaken by the lumber company as a separate enterprise, in no way connected with the operation of the joint venture between it and appellees. In other words, it bought this timber as a stranger would have bought it, and paid Mrs. Gibbs therefor $3.50 per thousand. This figure was agreed upon by the parties as covering the original cost of $2.50 per thousand, plus interest, taxes, carrying charges, etc. Under this agreement the lumber company paid to Mrs. Gibbs for the San Jacinto county timber the sum of $31,062.26, which was credited by her to the account of the joint venture. There was a substantial shortage in the San Jacinto county timber as estimated and conveyed by the 1910 contract. Appellees and the lumber company, acting through its president, Mr. Ford, construed the 1910 contract as guaranteeing the amount of the San Jacinto county timber. Appellees furnished the lumber company a statement of the claimed shortage in this timber and of the amount thereof with compound interest at 10 per cent. per annum in the sum of $20,869.40 which, when received by the lumber company, was examined by it and found to be correct and paid to appellees who, immediately upon receipt of its payment, credited the amount thereof to the joint venture. On this issue the trial court found that, under the contract and two deeds executed December 6, 1910, the lumber company guaranteed to Mrs. Gibbs that the pine and oak timber in San Jacinto, Jasper, and Newton counties, aggregated in quantity 78,700,000 feet. He further found the facts upon which this estimate was based. It was further found "in addition to the guaranty in the contract of December 6, 1910, Palmetto Lumber Company agreed, when it exercised its option to repurchase the San Jacinto County timber, to repurchase it on the same estimate on which it had previously sold the timber to Mrs. Gibbs." It was further found: "I find that the directors of the Palmetto Lumber Company, when they passed a resolution authorizing the making of the deeds and contract of December 6, 1910, intended to authorize and did authorize the officers to make a contract guaranteeing the timber covered by the deeds to aggregate 78,700,000 ft., 10 inches and up at the stump. I find that in making the contract, in exercising the option to repurchase the San Jacinto County timber and making settlement thereof, subsequently all parties made a practical construction of the contract to the effect that it did guaranty the quantity of 78,-700,000 ft."

Appellants sought to recover against the joint venture the amount of $20,869.40 paid for this claimed shortage, on the ground that it was paid through a mistake; that under the 1910 contract it was not liable for this shortage; and that the contract, as worded, was not subject to a practical construction making them liable for this shortage. On the facts found, as stated above, the trial court denied this claim. A reading of the contract, as summarized above, shows that the parties agreed that the pine and oak timber described in the contract aggregated 78,-700,000 feet, and was sold to Mrs. Gibbs on this estimate at $2.50 per thousand; on resale it was guaranteed by the lumber company that the timber covered by the deeds and contract of 1910 would net Mrs. Gibbs $2.50 per thousand plus the carrying charges, and the profit above the $2.50 per thousand feet on the sale of the timber was to be divided equally between the lumber company and Mrs. Gibbs. The resolution passed by the directors of the lumber company on November 2, 1910, authorizing the deeds and contract of date December 6, 1910, contained this clause: "The said timber now standing on the aforesaid tracts of land owned by this company is estimated and guaranteed to aggregate 78,700,000 feet, 10 inches and up at the stump, and the price to be paid for said timber shall be for 78,700,000 ft. at $2.50 per thousand ft."

The contract of December 6, 1910, gave the lumber company the option to re-

purchase the San Jacinto county timber at $2.50 per thousand, plus the carrying charges. On the facts, it was shown beyond controversy that the lumber company and appellees construed the contract of December 6, 1910, as guaranteeing the estimated stumpage in San Jacinto county. The analysis of the deeds and the contract of 1910 and the resolutions authorizing their execution, we think, fully supports the trial court's construction of these instruments as a guaranty of the estimated stumpage. But, if that construction did not follow as a matter of law, then the practical construction given by the parties to the language of these instruments fully supports the trial court's conclusion of guaranty. Under this guaranty the lumber company was liable for the shortage.

■ But, if it was liable for the shortage, appellants contend that the amount of the shortage calculated at the rate of 10 per cent. compound interest was only $11,012.43, and asked judgment for the overpayment in the sum of $9,856.97. This contention is denied. The lumber company was furnished with an itemized statement of the claimed shortage, examined, approved, and paid the same. In explanation of this payment, Mr. Ford testified: "I don't understand how on earth that thing got by me that way. I have given considerable thought to it; it is one of the first things I caught in this thing. Of course, if we had an agreement with Mr. Gibbs changing the rate of interest on the entire 1910 contract that would have explained most of it; that would have explained many things. The fact remains that Mr. Gibbs presented us a bill for those items showing compound interest, and we paid it."

■ In addition to the $196,750 consideration paid by Mrs. Gibbs to the lumber company on December 6, 1910, for the Carroll timber in Newton and Jasper counties and for the San Jacinto county timber, the lumber company at that time owed another note against the Carroll timber in the sum of $7,-606.36, which was not included in nor a part of the $196,750. This note was at that time held by Mrs. Harrison. Later the lumber company duly paid this note to appellees, who had purchased it from Mrs. Harrison, and in this action sought to establish a claim against the joint venture for the money so paid. This claim was correctly refused by the trial court. Under the warranty deeds given by the lumber company to Mrs. Gibbs it was bound to protect her against this note, and, in paying it, it merely discharged the obligations under its warranty. This payment did not constitute, in any sense, a contribution to the joint venture.

■■ By many propositions appellants assert that, since the contract of 1910 was made by the lumber company, under authority of its board of directors, Mr. Ford, as its president, was without authority to agree to a change therein without the consent of the directors; for the same reason Mr. Ford was without authority to agree to a change in the contract of 1910, charging the lumber company with the claimed shortage in the San Jacinto county timber to the amount of $20,-869.40; that the court erred in finding that the acts of Mr. Ford, as president of the lumber company, in agreeing to changes in the contracts, were known and approved by the board of directors; that there was no evidence that the board of directors knew or approved any change made by Mr. Ford in the written contract of April 25, 1918; that there was no evidence that appellants Miller and Black knew of, consented to or ratified any change in the interest rate of the 1910 contract or in the contract of April 25, 1918; that Ford's conduct in relation to these contracts was not binding on Miller and Black. On the issue of Ford's authority to act for the lumber company and Miller and Black, the trial court made the following findings:

"I find that while the Palmetto Lumber Company has possibly never been a one-man corporation in the sense that its president and presiding officer owned a majority of its stock, except possibly in 1922, I, nevertheless, do find that throughout the life of the company its president and general manager was A. C. Ford, and that during all of such times, and especially during the period of time involved in the litigated transactions herein the said Ford was the guiding genius of the company, controlling the selection of its directors and officers, and for the most part dominating their every action so far as the company's major policies, plans of operation, management, investments, etc., were concerned. That during the times mentioned the board of directors seldom acted as a board in business matters, except in instances where such action was required by the parties with whom it was having business relations, or for the purpose of selecting officers, increasing or diminishing its stock, etc.

"I find that during said period, for the most part, especially where these defendants and their predecessors in interest and management were concerned, that the said Ford, as such president, acted independently of the board of directors, except where corporate action was sought and required by the defendants or their predecessors, and that in each and every instance, including numerous timber purchases in which defendants were concerned, his actions and transactions of every nature were approved and confirmed without question by its officers knowingly acquiescing therein without protest, and in some instances, confirming them by corporate action.

"I find that in all engagements, contracts and matters referred to above, arising in connection with or growing out of the Oual-

line contract of 1915 as between the Palmetto Lumber Company on the one hand and the Gibbses on the other, that A. C. Ford acted as president of said Lumber Company, and that in each and every act and transaction in connection therewith was well known to the directors and officers of the Palmetto Lumber Company, and that with such knowledge they approved and acquiesced therein down to the time of the filing of this suit, or about said date."

The following summary of testimony sustains these findings: Ford made a verbal agreement changing the 1910 contract from a selling to a cutting contract; he extended the life of the venture more than six years beyond the term fixed by the 1910 contract; the resolutions passed by his board of directors authorized Ford to execute a five-year guaranty, yet by the 1910 contract he made a ten-year guaranty; he made verbal agreements in the name of the company for Gibbs to finance Oualline to buy the mill site and steel rails and to build kilns and sheds; additional timber was put into the venture under his verbal agreements, and he verbally agreed upon the division of the profits from the manufacture of the timber; he made a verbal contract with appellees to extend the tram to certain timber at great expense and ultimate loss to the joint venture. As we understand the record, these transactions were not authorized by his board of directors. As he had authority to make these contracts and to change the 1910 contract in the respects mentioned, it was a reasonable conclusion by the court that he had authority to agree to a change in the interest rate of the 1910 contract.

Since Ford, without consulting his board of directors, repurchased the San Jacinto county timber, he had authority to agree upon the purchase price and the terms of payment.

Miller and Black were well informed of all things done by the parties in the conduct of the joint venture, in many of which they participated. They knew that Mr. Ford was acting for them in many transactions. This authority was so generally exercised by Mr. Ford that the court was authorized to find that he had authority to represent them in the matters of which they now complain.

Since, on appellants' theory of the case, Mr. Ford had authority to agree to so many vital changes in the 1918 contract which they ratified on the trial of this case, and which were of vital interest to the lumber company, and without which it could not have joined in the prosecution of the joint venture, the court was justified in finding that he had authority, as appellees contend, to abandon that contract entirely and to enter into a verbal arrangement for the conduct of the joint venture.

The following additional facts tend to support the court's finding on the issue of Mr. Ford's authority: Acting for his company, he purchased from appellees 35,000,000 feet of timber for the use of the lumber company, not in connection with the joint venture, and executed notes and deeds of trust in payment. The minutes of the board of directors do not show any action authorizing this purchase. At various times he made for his company, by verbal contract, without authority from his board of directors, thirty-seven different purchases of timber. In 1918, acting for his company, he began negotiations with appellees to buy timber totaling, during the negotiations, 250,000,000 feet, and in 1920 he perfected negotiations with appellees to build for his company a tram from its mill to its timber. The investment amounted to about $110,000. His board of directors took no action in reference to these matters until October 20, 1922. From 1901, for more than twenty years, Mr. Ford, acting for his company, without authority from his board, had many transactions with appellees in addition to those named, such as buying timber, borrowing money, etc. On the facts stated, the law gave Mr. Ford authority to act for his company in all matters found by the court. Cook on Corporations, vol. 3, 2435, announces the rule: "The Board of Directors make corporate contracts by written vote of the Board, * * * or by allowing an agent to assume and exercise that power. * * * The Board of Directors and the corporation are bound also by the contracts of a director, or other person, who has assumed to contract for the company and for sometime has been allowed by the Board to so act and contract."

In Bossert v. Geis, 57 Ind. App. 384, 107 N. E. 95, it was held that authority may be conferred on the president of a corporation without express action of the board of directors, as where he was shown to have been acting as chief executive officer of the corporation, that he executed notes and contracts, and had full charge of the corporation's business with the knowledge of the directors. The Supreme Court of Pennsylvania, in Chestnut Street Trust & Savings Fund Co. v. Record Publishing Co., 227 Pa. 235, 75 A. 1067, 1068, 136 Am. St. Rep. 874, said: "Where the stockholders and directors turn over to an officer the full and absolute management of all corporation affairs, and permit him to exercise unrestrained control for a long course of time without instructions from or reference to any other authority, prima facie, the officer so intrusted may be taken to have power to do any act which the directors could authorize or ratify." See, also, Manhattan Life Ins. Co. v. Stubbs (Tex. Com. App.) 234 S. W. 1099; Baker v. Coleman Abstract Co. (Tex. Civ. App.) 248 S. W. 412; Arp & Hammond Hardware Co. v. Hammond Packing Co., 33 Wyo. 77, 236 P. 1033; Petten-

gill v. Blackman, 30 Idaho, 241, 164 P. 358; Hammitt v. Virginia Mining Co., 32 Idaho, 245, 181 P. 336; Peyton v. Sturgis (Tex. Civ. App.) 202 S. W. 205; Hanson Sheep Co. v. Farmers' & Traders' State Bank, 53 Mont. 324, 163 P. 1151.

Appellants assert that the court committed error in the accounting in the following respects: (a) They claim appellees sold certain of the Carroll timber belonging to the joint venture and appropriated the proceeds individually when it should have been credited to the account of the joint venture. The court found against this claim. (b) The court erred in refusing to charge appellees with the sum of $11,465 as the value of the timber left standing on the Carroll land at the end of the venture. (c) The cost to Mrs. Gibbs of the mill site in Jasper was $4,663.50. The court allowed appellees interest on this sum at the rate of 10 per cent. per annum compounded annually from April 25, 1918, to the end of the venture. Appellants assert that this was error. (d) The court erred in refusing to charge the joint venture with $1,953.18, the difference between the value of steel furnished by them and the amount redelivered to them. We have carefully reviewed the facts on these propositions and are convinced that the court's judgment has abundant support. The opinion is already too long to extend it by summarizing the evidence the court relied upon to support these findings.

The court concluded that the consolidation of the accounts as of December 31, 1921, was in law a stated account, and that these accounts, as consolidated, were entitled to full faith and credit. Appellants vigorously attack this conclusion. The findings of the court, which we have discussed, were made upon the theory that the burden of proof rested upon appellees, and upon that theory they have our approval. The account, as presented to the court, was evidentiary upon these issues, and without giving it the effect of a stated account, the judgment, in the respects reviewed by us, has full support. Appellees have filed cross-assignments of error against the judgment of the lower court correcting the account of December 31, 1921, against them, in certain vital respects. We have carefully reviewed the facts on these issues, and believe the judgment has support, even though the account of December 31, 1921, be construed as a stated account. We do not further discuss these cross-assignments nor quote evidence in support of our conclusions, because this opinion is already too long. For the reasons just stated, we pretermit a discussion of the issue of stated account. All propositions advanced by both parties challenging the sufficiency of the pleadings are overruled.

The following statement explains why we have not been able to give the facts in detail nor to cite and review in more detail the authorities relied upon in support of the propositions discussed: In the lower court the introduction of testimony herein began on June 25, 1929, and was not concluded until December 13, 1929. Argument in the lower court was begun on February 24, 1930, and concluded in the early part of March. The trial judge then practically abandoned all effort to give attention to any other business in his court, and gave himself over almost exclusively to a consideration of the record and briefs in this case until shortly prior to August 16, 1930, at which time judgment was entered. The conclusions of fact and law consume 57 pages of the transcript. The printed briefs filed herein contain more than 1,750 pages. The transcript contains 457 pages. The statement of facts consists of 16 large volumes. It was stated on oral argument that the proposition challenging the change in the interest provisions of the 1910 contract from simple interest at 10 per cent. per annum to compound interest, and the other propositions challenging appellees' right to charge compound interest, involved more than $500,000; and it was also stated that the interest charges in the accounting amounted to more than $1,400,000. The record reflects conclusive evidence that the able trial judge gave this case the most careful consideration, both on the law and facts. Believing that he properly disposed of all issues herein, it is ordered that the judgment of the lower court be, and the same is hereby, in all things affirmed.

## On Rehearing.

We supplement and correct our original opinion with the following additional fact findings:

(a) From December 6, 1910, to December 31, 1915, appellees kept the accounts of the venture. The record does not disclose that during that period any of these accounts were kept by appellants. The proof shows without dispute that beginning January 1, 1916, the number of accounts of the venture was increased, that appellees kept all of these accounts and appellants kept the five corresponding active accounts, and this practice was followed until December 31, 1921, at which time all of the accounts were consolidated into a single account, and thereafter until the end of the venture both appellants and appellees kept this account on their own books and kept the accounts accurately in balance by monthly interchange of detailed statements.

(b) After the consolidation of the accounts as of date December 31, 1921, the parties did not formally enter upon the books of the venture any interest charges. The following is the explanation for this: At the time the consolidated account was agreed to and entered on the books, the parties were of

the opinion that the venture would never pay the amounts then due, even if no further interest was charged. It was for this reason that the parties, on Mr. Dean's advice, omitted to charge on the books the $78,420.-84 as interest on country real estate timber. The letter of March 21, 1925, written by Mr. Ford, however, shows clearly that he fully understood that, while interest was not being entered on the books, under the agreement of the parties they had the right to enter it·if the venture earned enough to pay it. Therefore, when appellees were called upon to account, they stated the account as shown on the books, except that appropriate interest entries were made in accordance with the prior agreements, and the trial court found that the charging of interest under the circumstances was proper.

(c) While on the witness stand Mr. Ford testified that he had protested the interest charges, though the testimony as a whole, raised against him the issue that he had made no such protest. It was this fact issue that we had in mind in our original opinion where we found that Mr. Ford "admitted that he never protested against the interest charges"; also we had reference to the fact issue upon the whole record where we found that neither the lumber company·nor any one for it made any protest against the statement rendered as of February 7, 1922, showing compound interest charges; also, if there is any testimony that Mr. Ford protested the interest charges at the time of the consolidation, on the record as a whole, this issue should be found against him.

(d) Appellants criticize the conclusion in the original opinion that "we find nothing in the record even suggesting that Mr. Ford dealt with this account in the belief that on a final settlement compound interest on the 1910 contract would be taken out of the account." If, on the whole record, this issue was raised in Mr. Ford's favor, the record supports a conclusion against him on this issue.

(e) The money, if any, stolen by the employees of the lumber company, was of such insignificant amount that we withdraw our conclusion on that issue.

(f) Mrs. Gibbs was not a party to the contract of April 25, 1918, but appellees' interest in that contract was represented by Gibbs Bros. & Co.

(g) Appellants insist that there is no evidence that A. L. Black was a director of the lumber company on the 25th of April, 1918; that prior to that date he had been a director but had sold out his stock in the lumber company and was no longer a director, or even a stockholder. On this statement by appellants, which has not been controverted by appellees, we find that A. L. Black was not a director on April 25, 1918.

Appellees have also filed a motion for rehearing, which has had our most careful consideration. Except in the respects indicated above on appellants' motion to supplement and correct our conclusions of fact, the motions for rehearing by both parties are in all things overruled.